NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**PRIME TIME COMMERCE, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1783

---

Appeal from the United States Court of International Trade in No. 1:18-cv-00024-CRK, Judge Claire R. Kelly.

---

Decided: June 28, 2022

---

MARK B. LEHNARDT, Law Offices of David L. Simon, Washington, DC, argued for plaintiff-appellant.

ASHLEY AKERS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, PATRICIA M. MCCARTHY; BRENDAN SASLOW, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

---

Before LOURIE, MAYER, and CUNNINGHAM, *Circuit Judges*.

CUNNINGHAM, *Circuit Judge*.

Prime Time Commerce, LLC ("Prime Time"), a U.S. importer of cased pencils, appeals from the final judgment of the U.S. Court of International Trade ("Trade Court") sustaining the United States Department of Commerce's ("Commerce") application of the China-wide antidumping duty rate to Prime Time, rather than calculating an importer-specific rate. *Prime Time Com. LLC v. United States*, 495 F. Supp. 3d 1308, 1317–18 (Ct. Int'l Trade 2021) ("*Prime Time II*"). The Trade Court also held that Prime Time was barred from making arguments for which it failed to exhaust its administrative remedies by not commenting on Commerce's remand redetermination. *Id.* at 1316. For the reasons below, we *affirm*.

## I. BACKGROUND

### A. The Administrative Review

On December 28, 1994, Commerce issued an antidumping duty order on certain cased pencils from China. *Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China,* 59 Fed. Reg. 66,909 (Dep't of Commerce Dec. 28, 1994) ("*Cased Pencils Order*"). Commerce notified interested parties of the opportunity to request an administrative review of the order on December 1, 2016. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 81 Fed. Reg. 86,694 (Dep't of Commerce Dec. 1, 2016). Prime Time filed a timely request for administrative review of the order. J.A. 47–82 (Prime Time Commerce, LLC's *Request for Administrative Review* (Jan. 3, 2017)). On February 13, 2017, Commerce initiated an administrative review covering the period from December 1, 2015, through November 30, 2016. *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 82 Fed. Reg. 10,457, 10,459 (Dep't of Commerce Feb. 13, 2017) ("*Initiation Notice*").

In antidumping investigations of countries with non-market economies ("NMEs"), such as China, Commerce applies a rebuttable presumption that all exporters are subject to government control. *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1030–31, 1039 (Fed. Cir. 2021). Commerce uses a single antidumping rate for all companies that fail to demonstrate independence from government control. *Id.* at 1030–31.

Here, Commerce preliminarily assigned a 114.90% antidumping duty rate—the highest rate available—to all China-wide entities. *Certain Cased Pencils from the People's Republic of China*, 82 Fed. Reg. 43,329, 43,331 (Dep't of Commerce Sept. 15, 2017); *see also Prime Time II*, 495 F. Supp. 3d at 1312. One of these entities was Ningbo Homey Union Co., Ltd. ("Ningbo Homey"), Prime Time's supplier and exporter. *Id.* at 1311–12. Commerce had calculated the 114.90% rate from facts available with an adverse inference ("adverse facts available" or "AFA"). *Certain Cased Pencils from the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 48,612, 48,613 (Dep't of Commerce July 25, 2002), Dec. Mem. at cmt. 9 (citing 67 Fed. Reg. 2402, 2406–07 (Dep't of Commerce Jan. 17, 2002)) ("[W]e are relying on adverse facts available to determine the margins for the PRC-wide entity.").

Commerce invited companies seeking a separate rate to submit a separate rate application ("SRA") demonstrating their independence from the Chinese government. *Initiation Notice*, at 10,458.

## B. Ningbo Homey's Separate Rate Application and Prime Time's Submission

Ningbo Homey timely filed an SRA. J.A. 90–203 (*Separate Rate Application of Ningbo Homey Union Co., Ltd.*,

PR21/CR7-9 (Mar. 15, 2017)).  Commerce selected Ningbo Homey as the sole mandatory respondent.[1]  J.A. 207–09 (Department of Commerce's *Respondent Selection Memo* (March 30, 2017)).  Commerce then sent Ningbo Homey an antidumping questionnaire instructing it to "wholly and fully participate" in the administrative review, J.A. 216, "not selectively choose which requests to respond to," *id.*, and respond to questions on its separate rate status.  J.A. 210–307 (Department of Commerce's *Questionnaire to Ningbo Homey Union Co., Ltd.* (Apr. 3, 2017)).  Ningbo Homey declined to participate further in the review, however, due to its low export volume and value along with the expense and time commitment of participation.  Appellant's Br. 6.

Believing Ningbo Homey's rate to be significantly lower than the 114.90% China-wide rate, Prime Time sought to obtain an individual rate by providing additional information to Commerce.  *Id.*  Prime Time submitted information relevant to section C (U.S. sales) and section D (factors of production) of the questionnaire sent to Ningbo Homey.  J.A. 313, 334 (Prime Time Commerce, LLC's *Section C&D Questionnaire Response (Rejection Notice)* (May 10, 2017)).  Commerce rejected Prime Time's submission.  J.A. 334–36 (Department of Commerce's *Rejection Letter to Prime Time Commerce, LLC* (June 9, 2017)).  Commerce reasoned that Prime Time's submissions contained unsolicited new information because Commerce's questionnaire

---

[1]    Generally, Commerce must determine an individual dumping margin for each exporter.  19 U.S.C. § 1677f–1(c)(1).  But, where that is "not practicable," Commerce may limit its examination to a "reasonable number of exporters."  § 1677f–1(c)(2).  Commerce refers to those selected for individual investigation as "mandatory respondents."  *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372 (Fed. Cir. 2013).

was directed at Ningbo Homey, not Prime Time, and failed to "include a detailed narrative explaining why it should be considered." *Id.* at 334–35. Prime Time requested reconsideration, but Commerce did not change its decision. J.A. 351–56 (Prime Time Commerce, LLC's *Request for Reconsideration* (Aug. 3, 2017)).

## C. Commerce's Decision

In its Preliminary Results, Commerce determined that Ningbo Homey failed to respond to all parts of the questionnaire, denied the separate rate, and assigned Ningbo Homey the China-wide rate of 114.90%. *Certain Cased Pencils from People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2015-2016*, 82 Fed. Reg. 43,329, 43,330–31 (Dep't of Commerce Sept. 15, 2017) ("Prelim. Dec. Mem."). Commerce invited interested parties to comment on its preliminary results. *Id.* at 43,331. Prime Time renewed its request for reconsideration, arguing that Commerce should not have rejected its submission because Commerce had an obligation to use that information under 19 U.S.C. § 1677m(e). J.A. 383–84, 389, 394–95 (Prime Time Commerce, LLC's *Case Brief* (Oct. 16, 2017)). Prime Time also argued that Commerce's use of AFA was not warranted because Commerce should have considered neutral facts available to calculate the rate for Prime Time even if Commerce applied AFA to other Ningbo Homey shipments. J.A. 388. Prime Time lastly argued that the highest, most adverse rate determined was not proportional to Prime Time's diligence and efforts to cooperate by providing information to Commerce to calculate a rate for Ningbo Homey. J.A. 391–94.

Nonetheless, Commerce made no changes in its final results. *Certain Cased Pencils from People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 3,112 (Dep't of Commerce

Jan. 23, 2018) ("*Final Results*").  In its Final Results, Commerce reasoned that Ningbo Homey failed to establish eligibility for a separate rate because it did not provide information supporting reconsideration of its preliminary decision.  *Id.* at 3,113.  Commerce concluded that Prime Time's questionnaire response was properly rejected because it was incomplete, unsolicited, and did not come from the mandatory respondent, Ningbo Homey.  J.A. 399.

## D. Prime Time's Appeal

Prime Time appealed to the Trade Court.  The Trade Court found that Commerce erred in rejecting and removing Prime Time's submission from the record.  *Prime Time Com. LLC v. United States*, 396 F. Supp. 3d 1319, 1326–34 (Ct. Int'l Trade 2019) ("*Prime Time I*").  It further determined that "Commerce's decision not to consider Prime Time's efforts to comply with Commerce's requests for information is in accordance with law."  *Id.* at 1333–34.  The Trade Court remanded Commerce's final results, directing Commerce to accept into the record and consider Prime Time's submission "in the context of calculating an importer-specific assessment rate for Prime Time's entries," or, if Commerce did not calculate an importer-specific rate, explain why not doing so was reasonable.  *Id.* at 1323.

On remand, Prime Time resubmitted its information.  J.A. 604–1348 (Prime Time Commerce LLC's *Resubmission of Section C&D Questionnaire Response Information for Ningbo Homey Co., Ltd.* (Aug. 6, 2019)).  It explained that it "had difficulty obtaining all the information necessary to calculate a separate margin for Prime Time, and thus [sought] guidance from Commerce for any further request for Ningbo Homey information."  J.A. 611–12.  Prime Time suggested that the information in other parties' confidential prior-review submissions "be representative of Ningbo Homey to the extent applicable and missing from the submission herein (e.g., labor, energy, and other [factors of production])."  J.A. 612.  In its submission, Prime

Time included the public versions of other parties' prior-review submissions, which did not contain any confidential gap-filling information. J.A. 756–1331. Only Commerce had access to the confidential versions. J.A. 402.

In its draft remand redetermination, Commerce again declined to calculate an importer-specific rate on the grounds that Prime Time's submitted information was "incomplete," "unreliab[le]," and "unduly difficult" to piece together. J.A. 1358–59, 1364 (*Draft Results of Redetermination Pursuant to Remand Order* (Sept. 17, 2019)). Commerce again invited interested parties to comment on this draft redetermination. J.A. 1364. Prime Time chose not to comment. Accordingly, Commerce issued its final remand redetermination without calculating an importer-specific assessment rate for Prime Time. J.A. 1367–82 (*Final Results of Redetermination Pursuant to Remand Order* (Oct. 7, 2019)).

Once more, Prime Time challenged Commerce's refusal to calculate an importer-specific assessment rate before the Trade Court. J.A. 1383–96 (Prime Time Commerce LLC's *Comments on Remand Redetermination* (Nov. 6, 2019)). The Trade Court sustained Commerce's remand redetermination as supported by substantial evidence. *Prime Time II*, 495 F. Supp. 3d at 1318. The Trade Court held that Prime Time's arguments that Commerce failed to comply with the remand order and failed to place gap-filling information on the record were barred because Prime Time failed to raise them before Commerce in the first instance. *Id.* at 1313–14. Additionally, the Trade Court held that Commerce's practice of not calculating an importer-specific assessment rate where an importer's corresponding exporter failed to fully comply with Commerce's inquiries was reasonable because the burden was on "interested parties to populate the record; a burden which was not met in this case." *Id.* at 1317.

On appeal, Prime Time contests both the Trade Court's initial remand decision and its final decision. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

Prime Time raises two arguments on appeal. First, it argues that the Trade Court abused its discretion by requiring Prime Time to exhaust its administrative remedies as to its argument that Commerce should have looked to confidential information within Commerce's control to fill gaps in its evaluation. Appellant's Br. 25–34. Prime Time asserts that this confidential information would have allowed Commerce to calculate a separate rate for Ningbo Homey and an importer-specific antidumping rate for Prime Time, rather than using the high China-wide rate. *Id.* at 25–26, 33–34. Second, Prime Time argues that Commerce erred in using the highest available rate as an AFA rate because it did not conduct an "evaluation . . . of the situation that resulted in" the use of AFA as required by 19 U.S.C. § 1677e(d)(2). *Id.* at 34–35, 36–39. Specifically, Prime Time argues that Commerce should have considered information provided by Prime Time in determining what facts to rely on in calculating the applicable rate. *Id.* at 37–39. We address each argument in turn.

### A. Exhaustion of Administrative Remedies

Prime Time argues that the Trade Court abused its discretion in requiring exhaustion of administrative remedies because it would have been futile to repeat its argument before Commerce. Appellant's Br. 20. We disagree.

We review the Trade Court's decision to require exhaustion of administrative remedies for abuse of discretion. *Boomerang Tube*, 856 F.3d at 912. We reverse the Trade Court's decision only if the Trade Court "erred in interpreting the law, exercised its judgment on clearly erroneous findings of material fact, or made an irrational

judgment in weighing the relevant factors." *Id.* (citation omitted).

Generally, the Trade Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). The Trade Court typically takes a "strict view" of the exhaustion requirement in trade cases. *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). The exhaustion requirement applies equally in remand proceedings. *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1383–84 (Fed. Cir. 2008).

Prime Time does not dispute that it did not submit comments on Commerce's September 17, 2019, remand redetermination draft. Rather, Prime Time argues that its failure to exhaust its administrative remedies should be excused because raising its argument—that Commerce should look to confidential information in Commerce's control to provide gap-filling information necessary to calculate an independent rate for Prime Time—again would have been futile. Appellant's Br. 25–34.

While the futility exception may be applied where "enforcing the exhaustion requirement would mean that parties would be required to go through obviously useless motions in order to preserve their rights," the exception is narrow. *Corus Staal*, 502 F.3d at 1379 (internal quotations omitted). "The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Id.* Here, while it may have been *unlikely* that Commerce would have accepted Prime Time's arguments, it is far from *certain* that the government would have rejected them. And even when it is likely that Commerce would have rejected an argument, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency," for Prime Time to submit comments and "for Commerce to give its full and final administrative response in the final results." *See id.* at 1380.

This case is not akin to cases in which courts have held that exhausting administrative remedies would have been futile. *Cf. Cooper v. Marsh*, 807 F.2d 988, 990 (Fed. Cir. 1986) ("[A]n exception to the exhaustion doctrine [is] where pursuit of a remedy before a particular forum would be futile[.]"); *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105 (D.C. Cir. 1986) (explaining futility as involving the "certainty of an adverse decision"). Prime Time relies on *Itochu Building Products v. United States*, 733 F.3d 1140 (Fed. Cir. 2013), which is readily distinguishable. In *Itochu*, Commerce initially declined foreign nail manufacturer Itochu's request after Itochu "set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position." *Id.* at 1146. We explained that futility applies where "it [was] clear that additional filings with the agency would be ineffectual." *Id.* "Commerce had heard everything on the issue that Itochu had to say." *Id.* at 1147. Here, Prime Time raised new arguments before the Trade Court that were not previously raised before Commerce. *Compare* J.A. 611–12, *with* J.A. 1392–94. Because of Prime Time's failure to comment on Commerce's draft remand redetermination and the new arguments that it first raised before the Trade Court, Commerce was not given an opportunity to modify its final determination in response to arguments raised by the parties as it could have during administrative proceedings. Thus, we conclude that the Trade Court did not abuse its discretion in requiring Prime Time to exhaust its administrative remedies by commenting on Commerce's draft remand redetermination.

## B. Application of the China-Wide Rate

We next turn to Commerce's decision to apply the China-wide rate to Prime Time. We review decisions by the Trade Court de novo—the same standard under which the Trade Court reviews Commerce's determination—although we recognize that the Trade Court has unique and specialized expertise in this field. *Boomerang Tube LLC v.*

*United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citation omitted).  We uphold Commerce's calculation of an antidumping rate unless it is unsupported by substantial evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

We determine that Commerce's decision is supported by substantial evidence.  Commerce conducted a proper case-specific evaluation by applying the China-wide rate to Ningbo Homey, finding that Ningbo Homey failed to rebut the presumption of government control, and extending the China-wide rate to Prime Time as Ningbo Homey's corresponding importer.  Commerce's failure to consider Prime Time's efforts to cooperate as an interested party was harmless error.

First, we must consider whether 19 U.S.C. § 1677e applies.  Section 1677e governs when Commerce applies facts available, including AFA, in determining antidumping rates.  19 U.S.C. § 1677e.  The parties dispute whether the 114.90% China-wide rate is an AFA rate.  Appellant's Br. 37–38; Appellee's Br. 31, 35–36.  But regardless of whether the China-wide rate is an AFA rate or not, the statutory framework of 19 U.S.C. § 1677e can apply.  "The fact that a country-wide rate may have been calculated using AFA does not change its applicability to [an] NME entity that cooperated, but ultimately failed to qualify for a separate rate."  *Diamond Sawblades Mfrs.' Coal. v. United States*, 866 F.3d 1304, 1312 (Fed. Cir. 2017).  Although "[t]he statutory framework, including 19 U.S.C. §§ 1673d and 1677e(b) . . . explicitly applies only to market economy proceedings," we have permitted Commerce to "adopt[] that statutory framework in NME proceedings as well."  *Id.*  Commerce maintains "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."  *Id.* at 1311 (citation omitted); *see also*

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1352 n.6 (Fed. Cir. 2016) (holding that although § 1673d "explicitly applies only to market economy proceedings . . . Commerce has adopted it in non-market economy proceedings as well"). Thus, § 1677e applies. We next consider whether Commerce met the statutory requirements of that section.

Commerce conducted a proper evaluation under § 1677e(d)(2) in applying the highest available rate. We find unpersuasive Prime Time's contention that Commerce's application of the highest rate available to Prime Time's entries was unsupported by substantial evidence because Commerce did not conduct the evaluation required by 19 U.S.C. § 1677e. *See* Appellant's Br. 34–36. Subsection 1677e(d)(2) grants Commerce discretion to apply the highest available rate "based on the evaluation by [Commerce] of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. § 1677e(d)(2). Commerce must provide "case-specific evaluation" for its selection of the highest calculated rate. *POSCO v. United States*, 335 F. Supp. 3d 1283, 1285 (Ct. Int'l Trade 2018). "Evaluation of the situation" requires Commerce, "as part of its determination of applying the highest rate, to review the record to determine if there was something inappropriate or otherwise unreasonable about that rate, given the situation leading to the application of an adverse inference." *Hung Vuong Corp. v. United States*, No. 19-00055, 2021 WL 4772962, at *3, 6 (Ct. Int'l Trade Oct. 12, 2021) (citing *POSCO*, 335 F. Supp. 3d at 1285–86).

Here, Prime Time argues that the rate was unreasonable because Commerce did not properly consider evidence of Prime Time's efforts to cooperate as an interested party under § 1677m(e) and § 1677e(b)(1)(A). Appellant's Br. 23–24, 38–39. Subsection 1677m(e), which applies to administrative review proceedings under 19 U.S.C. § 1675 like the one at issue here, states that Commerce:

shall not decline to consider information that is submitted by an *interested party* and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the *interested party* has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e) (emphases added); *see also* 19 U.S.C. § 1677e(b)(1) ("If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], [Commerce], in reaching the applicable determination under this subtitle— (A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available . . . ."). The term "interested party" expressly includes "a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise." 19 U.S.C. § 1677(9)(A); *see also Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351, 1357 (Fed. Cir. 2021) ("Interested parties, including foreign producers or exporters of subject

merchandise, importers of such merchandise, and specified domestic trade associations, are allowed to participate in administrative reviews.") (citing 19 U.S.C. § 1677(9)(A)). United States importers, thus, are unambiguously considered to be interested parties. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984) (holding that effect must be given to the "unambiguously expressed intent of Congress" if "Congress has directly spoken to the precise question at issue"). As Prime Time argues, if Commerce finds that an interested party has failed to cooperate, Commerce has the discretion to use an adverse inference. Appellant's Br. 17.

Indeed, Commerce and the Trade Court misconstrued "interested party" by failing to consider the definition of "interested party." In its decision, the Trade Court explains:

> Prime Time, as the importer, is not the party whose actions are considered by Commerce when engaging in the adverse inferences analysis under 19 U.S.C. § 1677e(b). The "interested party" the statute refers to is the party to whom Commerce directed its requests for information and to whom the adversely chosen rate would apply. Accordingly, Commerce's decision not to consider Prime Time's efforts to comply with Commerce's requests for information is in accordance with law.

*Prime Time I*, 396 F. Supp. 3d at 1333–34. This analysis was incorrect; Prime Time is "the United States importer, of subject merchandise." Because the Trade Court declined to consider Prime Time's efforts to cooperate as an importer, the Trade Court thus erred.

However, the failure to consider Prime Time's efforts to cooperate was a harmless error. Prime Time's purported evidence of cooperation would not disturb the calculation of the 114.90% China-wide rate nor entitle it to a separate rate. Even "where a respondent in an NME country

cooperates with an investigation or review but fails to rebut the presumption of government control, Commerce may permissibly apply the country-wide NME entity rate." *China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1040 (Fed. Cir. 2021).  Under the framework of the presumption and requirement to rebut government control, the China-wide rate of 114.90% would nonetheless be applied to Prime Time's entries.  We thus affirm.  *See Suntec Indus. Co., Ltd. v. United States*, 857 F.3d 1363, 1372 (Fed. Cir. 2017) (finding Commerce's error to be harmless and affirming the Trade Court); *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings.").

## III. CONCLUSION

We have reviewed Prime Time's other arguments and find them unpersuasive.  Because Prime Time failed to exhaust its administrative remedies and because Commerce properly applied the China-wide rate to Ningbo Homey and Prime Time, we *affirm*.

## **AFFIRMED**